UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

KELVIN ALEXANDER CRUMPTON,

Defendant.

_____/

Case No.  13-20842

HONORABLE ARTHUR J. TARNOW
SENIOR UNITED STATES DISTRICT
JUDGE

HONORABLE MONA K. MAJZOUB
UNITED STATES MAGISTRATE JUDGE

**ORDER AND OPINION GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUITTAL [44], DENYING  DEFENDANT'S *PRO SE* MOTION FOR JUDGMENT OF
ACQUITTAL [46], AND DENYING THE GOVERNMENT'S MOTION TO STRIKE [47]**

After a three-day trial, a jury convicted Defendant under, *inter alia*, the Armed

Career Criminal Act.  The only evidence the Government offered to support that

conviction under the Armed Career Criminal Act were twenty-three bullets recovered

from the living area of another person adjacent to Defendant's living area and the

unwarned, non-voluntary, and unknowing inculpatory statements Defendant made

during custodial interrogation.  Because the Court now holds that Defendant's

inculpatory statements were improperly admitted, there is not substantial and

competent evidence to support Defendant's conviction under the Armed Career

Criminal Act.  This is because contraband recovered from premises over which

Defendant had nonexclusive possession, without more, as a matter of law cannot establish that Defendant had constructive possession of the bullets.

Before the Court now is Defendant's Motion for Judgment of Acquittal [44], the Government's Response [45], Defendant's *Pro Se* Motion for Judgment of Acquittal [46], and the Government's Motion to Strike Defendant's *Pro Se* Filing [47]. For the reasons that follow, Defendant's Motion for Judgment of Acquittal [44] as to his conviction under the Armed Career Criminal Act, 18 U.S.C. §§ 922(g), 924(e),—for possessing ammunition following three felony convictions—is GRANTED and Defendant's *Pro Se* Motion for Judgment of Acquittal [46] and the Government's Motion to Strike Defendant's *Pro Se* Filing [47] are both DENIED.

## STATEMENT OF FACTS

On October 18, 2013, law enforcement officers executed a state search warrant at 735 South Sloan Street, a residential structure that had been roughly divided into several apartments. Law enforcement obtained the search warrant after a confidential informant made a controlled purchase of crack cocaine from the location. When police executed the search warrant, they found Defendant with his girlfriend, Kimethia Tally, in the back section of the roughly divided apartments. Police also discovered several other people who were living or staying in the front area of the

building.  These people included Defendant's cousin, Ernest Crutchfield, tethered felon Brandon Navarre, William Tretyak, and Joseph Lucas.  Some of the occupants—but not Defendant—attempted to flee when the police began to execute the search warrant.  During the search police recovered twenty-three bullets from the front area of the building, away from Defendant's living area.  Police also recovered cocaine, heroin, and marijuana.

During the execution of the search warrant, an ATF Agent recorded conversations he had with Defendant in which Defendant made inculpatory statements.  The Government played three recorded conversations between the Agent and Defendant for the jury.  The chronology of the recordings is first Exhibit 41, then Exhibit 29, and lastly Exhibit 30.  Exhibit 41 contains the Agent's first insufficient set of warnings.  Exhibit 29 contains Defendant making inculpatory statements, specifically that he knew there were bullets in the front area of the building.  Exhibit 30 contains the Agent's second insufficient set of warnings and Defendant making further inculpatory statements, specifically that someone gave him the bullets and that he planned to give them away at some point.

The Government indicted Defendant—who has never been arrested for a violent crime—under the Armed Career Criminal Act on the basis of the twenty-three bullets recovered from the front of the structure away from his living area.  18 U.S.C.

§§ 922(g), 924(e).  Convictions under the Armed Career Criminal Act impose a minimum sentence of fifteen years of imprisonment.  The Government also indicted Defendant under 21 U.S.C. § 841—for possession of a controlled substance with intent to distribute—which carries a minimum sentence of five years of imprisonment.

During trial, Exhibit 41 revealed that the Agent's initial *Miranda* warning to Defendant was insufficient because the Agent neglected to inform Defendant of his right to discontinue questioning at any time.[1]  As a result, the Court instructed the jury to disregard Exhibit 29 because it contained audio of Defendant making inculpatory statements after the insufficient *Miranda* warning contained in Exhibit 41.

During trial, the Court admitted Defendant's inculpatory statements in Exhibit 30.  Defendant did not raise any objection about the sufficiency of the Agent's second *Miranda* warning in Exhibit 30 during trial or in his post-trial motions.[2]  On September 5, 2014, following a three day trial, a jury convicted Defendant on both counts of the indictment.

---

[1] As required by *Colorado v. Spring*, 479 U.S. 564, 573–74 (1987).

[2] Even in a direct criminal appeal, a reviewing appellate court may affirm a district court ruling "on any grounds supported by the record."  *United States v. Stewart*, 729 F.3d 517, 524 (6th 2013).

# ANALYSIS

## (I) Defendant's Motion for Judgment of Acquittal [44]

### (A) Acquittal under the Armed Career Criminal Act

In deciding Defendant's Motions [44, 46], the Court reviewed the Agent's second attempt to Mirandize Defendant recorded in Government Exhibit 30. During the Court's post-trial review, it became clear that, in fact, the Agent's second attempt to Mirandize Defendant was also insufficient and even if it were not insufficient, Defendant's waiver was invalid.[3] Consequently, Defendant's inculpatory statements contained in Exhibit 30 were improperly before the jury.

### (1) Standard

Defendant now moves for a Judgment of Acquittal, or in the Alternative, a Conditional New Trial pursuant to Rule 29. Defendant's Motion [44] seeks to vacate only his conviction under 18 U.S.C. §§ 922(g), 924(e)—the Armed Career Criminal Act. Federal Rule of Criminal Procedure 29(c)(2) allows a court to set aside a jury's guilty verdict and enter an acquittal if, after viewing the evidence in the light most favorable to the prosecution, the court determines no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States*

---

[3] The Agent's two insufficient attempts to Mirandize Defendant may not be cobbled together to become constitutionally sufficient. *See United States v. Garcia*, 431 F.2d 134 (9th Cir. 1970).

*v. Mack,* 729 F.3d 594, 603 (6th Cir. 2013).  To reverse, the Court must determine that the verdict is not supported by "substantial and competent evidence" on the record as a whole.  *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007).

### (2) Legal Framework

The Fifth Amendment to the United States Constitution prohibits any individual from being "compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V.  An individual who is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," must be provided information on the following "[p]rocedural safeguards" to protect his right against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona,* 384 U.S. 436, 478–79 (1966).[4]

"Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized [sic] of the constitutional right against self-incrimination and has validly waived this right."

---

[4] The requirement of advising suspects that they have the right to discontinue talking at any time was later added.  *See Spring*, 479 U.S. at 574.

*United States v. Cole,* 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda* 384 U.S. at 478–79).  Here, there are two bases that are each independently sufficient to entitle Defendant to acquittal on the Armed Career Criminal Act conviction.  First, Defendant was not sufficiently warned that his custodial statements could be used against him in court.  Second, even presuming *arguendo* that the warnings were sufficient, the totality of the circumstances indicates that Defendant did not validly waive his *Miranda* rights.  Under either rationale, Defendant's inculpatory statements were inadmissible, *Cole,* 315 F.3d at 636, and the remaining evidence is legally insufficient to support the conviction.

A suspect may validly waive his *Miranda* rights only if the waiver is made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444.  Waiver validity analysis contains two dimensions: voluntariness and comprehension. *Moran v. Burbine,* 475 U.S. 412, 421 (1986).  First, whether the right was relinquished voluntarily turns on whether the waiver was the product of a "free and deliberate choice" rather than the result of "intimidation, coercion, or deception." *Id*.  And second, whether it was waived knowingly and intelligently—or with comprehension—turns on whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  In evaluating both factors, courts must consider the "totality of the

circumstances surrounding the interrogation." *Id.* The culpability of an officer—that is, the intentionality or inadvertence of his actions—is irrelevant to the questions of both voluntariness and comprehension. *Id.* at 423.

The objective of *Miranda* warnings is not to mold police conduct for its own sake. *Moran*, 475 U.S. at 424–25. Rather, *Miranda* and its "corollary," *Edwards v. Arizona*, 451 U.S. 477 (1981)[5] have dual purposes: safeguarding a suspect's exercise of his constitutional rights in the face of the state's disproportionate power and providing clear guidance to law enforcement in how to handle custodial interrogations. *Arizona v. Roberson,* 486 U.S. 675, 680 (1988). In fact, the Supreme Court has praised the "relativ[e] rigid[ity]" and "clear and unequivocal" nature of the *Miranda* and *Edwards* rules as one of their chief benefits. *Fare v. Michael C.,* 442 U.S. 707, 718 (1979); *Roberson,* 486 U.S. at 682. Indeed, "[t]he merit of the *Edwards* decision," according to the Supreme Court, "lies in the clarity of its command and the certainty of its application." *Minnick v. Mississippi,* 498 U.S. 146, 151 (1990); *Roberson,* 486 U.S. at 680 ("As we have stressed on numerous occasions, one of the principal advantages of *Miranda* is the ease and clarity of its application") (internal quotation marks and citation omitted). The Supreme Court has repeatedly

---

[5] Although *Edwards* involved an issue of a suspect invoking a different right after *Miranda* warnings—his right to counsel during a custodial interrogation—its reasoning applies with equal force here.

emphasized the virtues of a bright-line rule in cases following *Edwards* as well as *Miranda.  Minnick,* 498 U.S. at 151.

Supreme Court precedent indicates that in this area of law, neither suspect, nor police officers, nor the public benefit from rules that abide ambiguity.  Law enforcement must be advised about the limits of its authority, so that it is not subjected to judicial second guessing as to its methods, or burdened by undue complexity in the discharge of its investigatory work.  *Davis v. United States,* 512 U.S. 452, 461 (1994).  The Court's commitment to clarity is driven by the reality that the inherently coercive setting of custodial interrogation foments intentional and inadvertent infringement of constitutional protections.  Therefore, it is imperative that suspects are plainly advised of their rights so they are enabled to act on them.  *See Dickerson v. United States,* 530 U.S. 428, 435 (2000) ("Because custodial police interrogation, by its very nature, isolates and pressures the individual, we stated that 'even without employing brutality, the "third degree" or other specific stratagems, custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.'") (quoting *Miranda,* 384 U.S. at 455)).

In *Dickerson*, in the year 2000, the Supreme Court determined that Congress does not have the constitutional authority to overrule *Miranda* (which Congress had attempted to do via 18 U.S.C. § 3501), held § 3501 unconstitutional, and reaffirmed

the importance of courts' robust enforcement of *Miranda*.  In *Miranda*, the Court noted that the advent of modern custodial police interrogation brought with it an increased concern about confessions obtained by coercion.  *Dickerson*, 530 U.S. at 434–35.  The *Miranda* Court concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself."  *Dickerson*, 530 U.S. at 435.  Accordingly, the Court laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow."  *Dickerson*, 530 U.S. at 435 (citing *Miranda*, 384 U.S. at 442).

### (3) Custodial Interrogation

A law enforcement officer's obligation to administer *Miranda* warnings attaches only when a suspect is subject to a custodial interrogation.  *Loza v. Mitchell*, 766 F.3d 466, 475 (6th Cir. 2014).  In determining whether a defendant was subject to custodial interrogation, for the purposes of determining whether his Fifth Amendment rights were violated, a court looks to the totality of the circumstances to determine how a reasonable man in the suspect's position would have understood the situation.  *United States v. Swanson*, 341 F.3d 524, 528–29 (6th 2003).  The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the

degree associated with a formal arrest. *Id.* at 529. In determining whether a defendant was subject to custodial interrogation, for the purposes of determining whether his Fifth Amendment rights were violated, a court considers (1) whether a reasonable person in the defendant's position would feel free to leave, (2) the purpose of the questioning, (3) whether the place of the questioning was hostile or coercive, (4) the length of the questioning, (5) other indicia of custody such as whether the defendant was informed at the time that the questioning was voluntary or that he was free to leave or to request the officers to do so, whether the suspect possessed unrestrained freedom of movement during questioning, and whether the suspect initiated contact with the police or acquiesced to their requests to answer some questions. *Id.*

Before the Agent began his line of questioning in Exhibit 30, he had placed Defendant in handcuffs. When the Agent questioned Defendant, he isolated him in a room away from the other suspects—enhancing the coercion inherent in police questioning. When Defendant stopped responding to the substance of the Agent's questions, the Agent placed Defendant back into handcuffs and put him back outside with the other suspects. *See  United States v. Malcolm*, 435 F. App'x 417 (6th Cir. 2011); *United States v. Brooks*, 379 F. App'x 465 (6th Cir. 2010); *United States v. Panak*, 552 F.3d 462 (6th Cir. 2009); *United States v. Flores*, 193 F. App'x 597 (6th

Cir. 2006); *United States v. Thomas*, 142 F. App'x 896 (6th Cir. 2005); *United States v. Protsman*, 74 F. App'x 529 (6th Cir. 2003) (all citing suspects' lack of being handcuffed to support conclusion that suspect was not subject to a custodial interrogation).  When the Agent handcuffed Defendant and put him back with the other suspects after questioning it was for an indefinite length of time or until Defendant changed his mind and would to talk to the Agent more.

Further, the Agent had attempted to Mirandize Defendant before the recording contained in Exhibit 30, indicating that the Agent believed he was subjecting Defendant to a custodial interrogation and that Defendant was not free to leave. Exhibit 41 contains the Agent's first insufficient administration of the warnings.  So, by the time Defendant was speaking on the recording in Exhibit 30, a reasonable man in his position would have believed he was not free to leave.  The Agent had placed a restraint on Defendant's freedom of movement to a degree associated with a formal arrest.  Because Defendant was subject to a custodial interrogation, he was entitled to an sufficient *Miranda* warning before he made the statements contained in Exhibit 30.  *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (reaffirming that *Miranda* warnings must be given to all suspects prior to custodial interrogation).

### (4) Sufficiency of the Warning in Government Exhibit 30

Precise words from *Miranda* do not have to be used when giving the warnings,

however the warnings must apprise a suspect, *inter alia*, that anything he says can be used against him in a court of law.  *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010).  In determining whether a law enforcement officer adequately conveyed the *Miranda* warnings, a court's inquiry focuses on whether the warnings reasonably conveyed to the suspect his rights as required by *Miranda*. *Id.* (citing *Florida v. Powell*, 130 S. Ct. 1195, 1204 (2010)).

The Agent's attempt to Mirandize Defendant as memorialized in Exhibit 30 was insufficient because the Agent directly contradicted one the of judicially required warnings.  Specifically, in the middle of the Agent's second attempt to administer the *Miranda* warnings, the following exchange occurred:

> Agent:      Anything you say can be used against you in court. You understand that?
> Defendant:  Yes. [inaudible] We going to court?
> Agent:      No.[6]

Government Trial Ex. 30 at 1:44.  Defendant's intonation during this exchange conveys legally significant non-semantic information.  First, that Defendant's initial "yes" response was perfunctory and that he had not yet actually considered the import

---

[6] The Agent did not correct the misinformation he had just provided Defendant, but instead went on to say, "I'm just saying, in general, anything you say can be used against you in court. These are your rights. I'm reading them to you on a piece of paper. If you understand that put your initial next to the dot." Tr. Ex. 30 at 1:55.

of the warning about court.  Second, that, once he had recognized the import of the warning about court, he was surprised to hear that he may be going to court.  And third, that his worry about going to court was assuaged by the Agent's assurance that he was not going to court—in other words, that Defendant subjectively believed there was no risk of going to court.  In fact, Defendant was arraigned in court later that same day.  There are many informative auditory cues throughout the interrogation, such as intonation, pauses, and non-semantic vocalizations that a transcript would not adequately convey.  As a result, the Court is appending the audio of Government Exhibit 30 to this Opinion so readers can appreciate the extent to which Defendant and the Agent were talking past each other.[7]

In Exhibit 30, the Agent administered one of the judicially required warnings and then immediately directly contradicted it.  Direct, unequivocal contradiction of a required warning is more egregious than not administering the warning at all.  Given that not administering a warning at all would not reasonably convey a suspect's rights to him, the Court cannot say that directly contradicting a warning reasonably conveys a suspect's rights to him.  Consequently, Defendant's subsequent statements in Exhibit 30 were inadmissible as they were unwarned statements.  *See Oregon v. Elstad,* 470 U.S. 298, 307 (1985), (holding that unwarned statements made during a

---

[7]

custodial interrogation are not admissible regardless of whether the statements were voluntary or whether a constitutional violation occurred). Thus, where an officer administering the *Miranda* warnings directly contradicts one of the warnings, there is a cognizable constitutional infirmity.

The Court holds that Exhibit 30 contains a recording of an insufficient administration of the judicially required warning to Defendant that anything he said could be used against him in court. However, out of an abundance of caution, the Court will now posit that the warnings contained in Exhibit 30 were sufficient for the sake of conducting voluntariness and comprehension of waiver analyses.

### (5) Voluntariness of Waiver

Defendant voluntarily relinquished his right to remain silent only if his waiver was the product of a "free and deliberate choice." *Moran,* 475 U.S. at 421. If an officer deceives a suspect in order to obtain a waiver of *Miranda* rights, the waiver was not voluntary. *Id.* Defendant's waiver was not voluntary because the Agent deceived Defendant into believing that his statements would not be used against him in court. *Id*. The Court takes no position on whether the deception was intentional or inadvertent as that question is irrelevant to voluntariness analysis. *Id.* at 423. The Agent deceived Defendant by unequivocally telling him that he was not going to court and, by all indications, Defendant relied upon that deception. The Agent further

deceived Defendant into signing the waiver by telling him there was "nothing on [Defendant] yet," further intimating that Defendant was not at risk of criminal prosecution or going to court.  Ex. 30 at 4:19.

Alternatively, if an officer coerces a suspect in order to obtain a waiver of *Miranda* rights, the waiver was not voluntary.  *Moran,* 475 U.S. at 421. Psychological pressure alone may render a confession coerced.  *See Townsend v. Sain*, 372 U.S. 293, 307 (1963) (*overruled on other grounds by Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715 (1992)) (*accord. United States v. Bulger*, 993 F.2d 1547, 1547 (6th Cir. 1993).  Because coercion goes to the voluntariness of a waiver, whether the coercion was intentional or inadvertent is also irrelevant to coercion analysis and the Court takes no position on the Agent's culpability. *Moran,* 475 U.S. at 423.  Defendant's waiver was not voluntary also because he was coerced in several ways into signing the waiver.

For instance, many times throughout the administration of the warnings in Exhibit 30, Defendant asks the Agent to see a warrant.  Mostly, the Agent deflects Defendant's requests and presses forward with executing the waiver.  The Agent never explicitly told Defendant that he would only show Defendant the warrant if Defendant signed the waiver.  However, in response to one of several of Defendant's warrant requests, the Agent said, "I'll show it to you [pause] in a little while."  Ex. 30

at 3:07. As a law enforcement professional who is experienced at generating recorded statements, the Agent avoided explicitly conditioning showing Defendant the warrant on his signing the waiver, but that is effectively what he did. As an experienced law enforcement professional, the Agent also knew that showing Defendant the warrant was immaterial to obtaining a valid *Miranda* waiver. However, Defendant's understandably lay knowledge of constitutional law caused him to focus almost entirely on the warrant during the administration of the warnings. At one point, Defendant even stated, "I want to see the search warrant before I sign anything." Ex. 30 at 3:20. The Agent dangled the carrot of showing Defendant the warrant, which coerced him into signing the waiver. In doing so, the Agent violated the judicial requirement that a suspect's waiver not obtain as a product of coercion. *Moran,* 475 U.S. at 421.

The totality of the recording reveals that the Agent coerced the Defendant into signing the waiver by repeatedly interrupting and belittling the Defendant whenever he expressed concerns about signing the waiver. At one point when Defendant was communicating that his aversion to signing the waiver, another unidentified law enforcement officer chimes in and says, "sounds like you been dealt with some shady [inaudible]." Ex. 30 at 4:15. The Agent coerced Defendant into waiving his rights by ignoring the many obvious indications that Defendant did not want to sign the

waiver.   There are many such indications throughout the recording, including Defendant explicitly indicating he did not want to give consent or waive anything. Ex. 30 at 3:31.

The Agent also coerced Defendant by keeping him in the cold outdoors while he was resisting waiving his rights, brought him inside once Defendant had waived his rights, and put Defendant in handcuffs back outside in the cold after he stopped answering the Agent's questions.  *See* Ex. 30 at 2:25 (before Defendant signed the waiver, he states that he was cold and the Agent promises he would be warm shortly) *compared with* Ex. 30 at 5:41 (after Defendant signed the waiver, he audibly shivers and the Agent notes that he was warming up now that he is inside) *and* Ex. 30 at 17:30 (after Defendant refused to talk to the Agent anymore, the Agent put Defendant back in handcuffs and took him back to the cold out of doors).  The Agent also implied to Defendant that his girlfriend would be interrogated if he did not answer the Agent's questions about the controlled substances. Ex. 30 at 14:20 (after Defendant refused to estimate the amount of drugs in the building, the Agent asked Defendant if the drugs were his girlfriend's and what she would say if he were to go interview her).

Ironically, the Agent also coerced Defendant into signing the waiver by ad-libbing an exaggerated representation about the lower threshold for what constitutes

coercion.  Ex. 30 at 2:51. ("[Reading waiver:] At this time I'm willing to answer questions without a lawyer present . . . No pressure or force of any kind has been used against me. [Ad-libbing]: We're not beating you up.  We're not withholding water from you or anything like that, right?") In fact, psychological coercion alone is sufficient to violate a suspect's Fifth Amendment rights.  *See Townsend*, 372 U.S. at 307 (*overruled on other grounds by Tamayo-Reyes*, 112 S. Ct. 1715) (*accord. Bulger*, 993 F.2d at 1547).

One of the purposes of the warnings is to dissipate the coercion inherent in custodial interrogation and, in so doing, guard against abridgement of a suspect's Fifth Amendment rights.  *Moran*, 475 U.S. at 424–25.  If officers do not follow the *Miranda* and *Edwards* rules rigidly—as the Court intended—then the lurking coercion that the Supreme Court recognizes as inherent to custodial questioning by default dictates the course of the interrogation.  *Fare,* 442 U.S. at 718; *Roberson,* 486 U.S. at 682;  *Minnick,* 498 U.S. at 151; *Dickerson*, 530 U.S. at 435.  The facts here present the very type of case about which the *Miranda* and *Dickerson* Courts were concerned: one in which the line between voluntary and involuntary statements was blurred by the inherent coercion of interrogation.  *Dickerson*, 530 U.S. at 434–35.  It is plain from the recording that the Agent's administration of the warnings was insufficient to disarm the inherent compulsion of custodial interrogation and

Defendant's waiver was involuntary.

### (5) Comprehension of Waiver

Whether Defendant knowingly and intelligently relinquished his right to remain silent turns on whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421. Defendant's reliance on his belief that he was not going to court, and thus that his statements would not be used against him in court, indicates that he did not have the requisite level of "comprehension of the full panoply of rights set out in the *Miranda* warnings and of the potential consequences of a decision to relinquish them." *Id.* at 422.

First, the audio contains several indications that Defendant did not have a full awareness of the nature of the right he was abandoning. In fact, the audio reveals both that Defendant did not know what his rights were and that he desired to preserve any rights that he might have. For example, when the Agent asked Defendant to sign "the waiver part," Defendant asked to see "the search warrant or arrest warrant or whatever you have." Ex. 30 at 3:01. This inquiry by Defendant shows that he wished to reserve his rights, but did not know exactly what they were. Stated another way, Defendant did not have a full awareness of the nature of his rights. Expressing his aversion to signing the waiver, Defendant said, "It's like I'm giving consent then if

I waive anything" and further communicated his unwillingness to sign "this type of paperwork." Ex. 30 at 3:31; 3:45. This exchange, which runs from around 2:58 until around 3:50, is one instance where the transcript fails to convey what the audio makes clear. Namely, that Defendant did not subjectively understand his rights and, further, that he did not want to waive any rights he had. Defendant explicitly indicates that he does not want to "waive anything," *id est*, his rights. There is no clearer indication that someone does not comprehend the nature of the right he is abandoning than saying he does not want to waive anything and then signing a waiver. That seeming incongruity can only be explained by the coercion to which Defendant was subjected, as described in section (I)(A)(4) of this opinion. The audio makes plain that the second *Miranda* warning was insufficient at ensuring that Defendant understood his Fifth Amendment rights.

Second, the Agent's deception prevented Defendant from appreciating the consequences of relinquishing his right to remain silent. Although the Constitution does not require that a suspect know and understand every possible consequence of waiver of his Fifth Amendment rights, going to court is an explicitly required consequence of which suspects must be warned. *Spring*, 479 U.S. at 574. The Agent misled Defendant that going to court was not even a possible consequence of Defendant abandoning his right to remain silent. When, in fact, as noted *supra*,

Defendant was arraigned later that same day.  The intonation that can only be perceived by listening to the audio of the recording plainly reveals that the *Miranda* warning about court piqued Defendant's attention.  Defendant asked the Agent for clarification of the court warning and the Agent deceived Defendant into believing he was not going to court.  The audio further reveals that Defendant was satisfied with the Agent's assurance that he was not going to court and relied on that assurance.  Consequently, Defendant waived his right to remain silent without a full awareness that a consequence of speaking included going to court, rendering the waiver unknowing and unintelligent.  *Moran,* 475 U.S. at 421.  Defendant's waiver of his right to remain silent was also invalid on the basis that it was not knowing or intelligent, in addition to being involuntary.

This case presents to courts a prospective question about the import of *Miranda* and its progeny as it relates to contemporary police routines and the requisite level of comprehension.  Just as routine police coercion of confessions inspired the precedent in *Miranda*,[8] perhaps the modern routine presentation of Miranda waiver forms to suspects mandates a new explicit warning that suspects do not have to sign the waiver.  Listening to Exhibit 30, there is no indication that the administration of

---

[8] *Dickerson*, 530 U.S. at 434–35 ("In *Miranda*, we noted that the advent of modern custodial police interrogation brought with it an increased concern about confessions obtained by coercion.")

the warnings is separate from the waiver of the warnings.  It was presented to Defendant as a formality to be rushed over "so that we can discuss what's going on." Ex. 30 at 3:36.

### (6) Harmless Error Analysis

The introduction of a confession[9] obtained in violation of *Miranda* is reviewed for harmless error.  *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991).  If evidence is before a jury in error, the Court's rulings are "harmless unless it is more probable than not that the error materially affected the verdict."  *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008).  The Court's inquiry is not "whether there was sufficient evidence on which [the defendant] could have been convicted without the evidence complained of," but rather the "question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  *United States v. Galloway*, 316 F.3d 624, 639 (6th Cir. 2003) (citing *Fahy v. Connecticut*, 375 U.S. 85, 87 (1963)).  Before a federal constitutional error can be held harmless the reviewing court must be able to declare a belief beyond a reasonable doubt that the error was harmless.  *Fulminante*, 499 U.S. at 308.

In Exhibit 30, Defendant stated that he knew the ammunition was in the front

---

[9] Exhibit 30 contains a confession because it memorialized Defendant's specific intent to exercise dominion and control over the bullets in the future as required to prove constructive possession.  *See* section (I)(A)(7) *infra*.

of the structure and that he was eventually going to give it to someone else. Ex. 30 at 15:34. Without Exhibit 30, the only remaining evidence submitted to the jury regarding to whom the ammunition belonged was Defendant's mother's testimony. Defendant's mother testified that the ammunition belonged to Crutchfield and Tally. There was no evidence that Defendant's fingerprints were on the bullets. As a result, the Court cannot say beyond a reasonable doubt that the erroneously admitted Exhibit 30 was harmless. There is near certainty—more than the required reasonable possibility—that the evidence in question—Exhibit 30—contributed to his conviction under the Armed Career Criminal Act because the Exhibit 30 was the only evidence that the bullets belonged to Defendant. *Galloway*, 316 F.3d at 639. It was not harmless error to submit Exhibit 30 to the jury.

### (7) Substantial and Competent Evidence Analysis

Without Defendant's inadmissible statements, the guilty verdict under the Armed Career Criminal Act is not supported by substantial and competent evidence and must be vacated. FED. R. CRIM. PRO. 29(c)(2); *Grubbs*, 506 F.3d at 438. To convict Defendant, the Government needed to show beyond a reasonable doubt that (1) he had a previous felony conviction, (2) he knowingly possessed the firearm specified in the indictment, and (3) the ammunition traveled in or affected interstate commerce. *Grubbs*, 506 F.3d at 439. Only the second element—possession—is in

question here.

Since investigators did not find Defendant in actual possession of the ammunition, substantial and competent evidence must show that he had constructive possession for the conviction to stand. Constructive possession exists when the defendant "does not have possession but instead knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008) (internal citation omitted). The theory of constructive possession requires specific intent. *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006). Nonexclusive possession of the premises, without more, cannot establish constructive possession over contraband found within the premises. *United States v. Bailey*, 553 F.3d 940, 945 n.3 (6th Cir. 2009).

The ammunition was recovered from the front area of a structure that was roughly divided into apartments in which several other people were living. Defendant, Defendant's girlfriend, Defendant's belongings, and Defendant's living area was found in the back area of the structure. Evidence that the ammunition was recovered from a structure over which Defendant shared possession with several other people, without more, is insufficient to prove that Defendant had constructive possession of the ammunition. *Bailey*, 553 F.3d at 945 n.3. Viewing the evidence in

the light most favorable to the prosecution, as a matter of law, the admissible evidence cannot prove that Defendant had constructive possession of the ammunition recovered during the search. *Id*. Defendant is entitled to a judgment of acquittal because his conviction under 18 U.S.C. §§ 922(g), 924(e) is not supported by substantial and competent evidence and no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt on the admissible evidence presented. *Grubbs*, 506 F.3d at 438; *Mack,* 729 F.3d at 603.

### (B) Defendant's Alternative Motion for Conditional New Trial

Defendant alternatively moves for a conditional new trial under Federal Rule of Criminal Procedure 29(d). Rule 29(d) requires a court that enters a judgment of acquittal after a guilty verdict to conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. "Trial error" is error which occurred during presentation of the case to the jury and may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. *Fulminante*, 499 U.S. at 307–08.

During trial, Exhibit 29, which indicated Defendant's knowledge that bullets were in the front area of the building, was played for the jury. The Court subsequently ruled that Defendant had not been sufficiently warned when he made

those inculpatory statements and instructed the jury to disregard Exhibit 29. Throughout the acquittal analysis *supra*, the Court assumed that the jury earnestly followed its instruction to disregard Exhibit 29. However, turning now to the question of a conditional new trial, it is necessary to discard that legal fiction.

The Supreme Court has recognized that some occurrences at trial are too prejudicial to rely on a curative instruction to ensure a Defendant's due process rights are not violated. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974). This was a very short trial—the opening statements, presentation of evidence, and closing statements together were less than seven and a half hours. The brevity of the trial heightens the probability that one of only two of Defendant's recorded statements had a profoundly prejudicial effect on the jury. Further heightening the case for re-trial, in this instance the curative jury instruction implicated the accused's right to remain silent. Should all three redundant bases for acquittal presented in this order be reversed, the Court concludes that Defendant is entitled to a new trial because in the new trial only Exhibit 30 would be presented to the jury and not Exhibit 29. This would cut the number of inculpatory recordings submitted to the jury in half. It would also better enable the jury to weigh the coercion in Exhibit 30, as the jury's attention would not be divided between the two recordings.

**(II) Defendant's *Pro Se* Motion for Judgment of Acquittal [46] and the Government's Motion to Strike [47]**

In his *Pro Se* Motion for Judgment of Acquittal [46], Defendant argues that the Government listed the same evidence of narcotics possession against Defendant twice—once as obtained during a controlled buy[10] from Defendant and once as recovered from Defendant's building. The Court has previously rejected this argument and rejects it again now. The Government has explained that the evidence of controlled substances obtained from the controlled buy was merely listed together with the evidence obtained from the search. That does not mean it was used against Defendant twice. Further, the amount at stake in Defendant's argument is irrelevant to his conviction and highly likely to be irrelevant to his sentence. Accordingly, Defendant's *Pro Se* Motion for Judgment of Acquittal is denied.

The Court also denies the Government's Motion to Strike Defendant's *Pro Se* Filing [47] because the Government has not cited any legal authority for its motion, save a cursory and inapplicable reference to Federal Rule of Civil Procedure 12(f).[11]

---

[10] Defendant denies that the controlled buy ever happened.

[11] A quick review of the Federal Rules of Criminal Procedure reveal that the Government did not intend to reference Criminal Rule 12(f), which is not pertinent to the issues here and states: "All proceedings at a [pre-trial] motion hearing, including any findings of fact and conclusions of law made orally by the court, must be recorded by a court reporter or a suitable recording device."

The Federal Rules of Civil Procedure do not govern criminal matters. Fed. R. Crim. P. 1(a) (1) (stating that the rules of criminal procedure govern criminal cases); Fed. R. Civ. P. 1 (limiting the scope of the rules of civil procedure); *United States v. Gibson*, 424 F. App'x 461, 464 (6th Cir. 2011).  Further, the District Court may entertain *pro se* filings from a represented party in its discretion.  *United States v. Mosely*, 810 F.2d 93, 98 (6th Cir.1987) ("hybrid representation is a matter committed to the sound discretion of the trial court.")

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Judgment of Acquittal [44] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant is entitled to a judgment of acquittal on his conviction under 18 U.S.C. §§ 922(g), 924(e).

**IT IS FURTHER ORDERED** that Defendant's oral second motion for acquittal is **GRANTED** as to his convictions under 18 U.S.C. §§ 922(g), 924(e) for the reasons stated in this Order.

**IT IS FURTHER ORDERED** that Defendant's *Pro Se* Motion for Judgment of Acquittal [46] is **DENIED**.

**IT IS FURTHER ORDERED** that the Government's Motion to Strike Defendant's *Pro Se* Filing [47] is **DENIED**.

**SO ORDERED**.

Arthur J. Tarnow
Senior United States District Judge

Dated: February 16, 2015